LIVERPOOL, L. & G. INS. CO. (THOMPSON v.). See Case No. 13,966.

## Case No. 8,406.

### The LIVERPOOL PACKET.

[1 Gall. 513.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1813.

PRIZE—CONCEALMENT AND FALSIFICATION OF PAPERS—TRADE WITH NEUTRAL PORT—PROBABLE CAUSE FOR CAPTURE.

1. On the original hearing, if the character and origin of the captured property be in question, the court should order a survey and report.

[Cited in The Palo Alto, Case No. 10,700.]

2. In cases of fraudulent concealment and falsification of papers, further proof is not allowed to the party.

[Cited in brief in The Revere, Case No. 11,716.]

3. If a claim be founded in illegal conduct, it must be rejected, and if such illegality be a cause of municipal forfeiture, and not jure belli, the property will be condemned to the United States.

4. A trade to a neutral port is not illegal, although the public enemy derive benefit thereby, unless such trade be carried on in connection with, or subservient to hostile interests and policy.

[1] [Reported by John Gallison, Esq.]

5. In what cases further proof allowed to captors.

6. The captors are not liable to damages, where there is probable cause of capture. What constitutes such probable cause.

[Cited in Williams v. Delano, 155 Mass. 14, 28 N. E. 1,123.]

See The Rover [Case No. 12,091.]

7. A voyage by a vessel from an enemy port with a cargo on board, without the license of our government, is of itself a probable cause for the capture of the vessel and cargo.

[Appeal from the district court of the United States for the district of Massachusetts.]
In admiralty.

Sprague & Pitman, for captors.

Mr. Prescott, for Nickels, Smith, and Hall & Thatcher.

Mr. Dexter, for John C. Jones.

STORY, Circuit Justice. The ship Liverpool Packet and cargo were captured a few miles without half-way rock in Boston Bay, on the 20th of July, 1813, by the privateer Castigator, Stephen G. Clark, commander. From the papers on board, and the preparatory evidence, it appears, that the ship sailed from Charleston, S. C., in the last spring, with a cargo of rice, bound for Lisbon, at which port she arrived and safely delivered her cargo. At Lisbon a return cargo was taken on board, principally on freight, consisting of about 407 moys of salt, 150 frails of raisins, 100 boxes of lemons, and 61 bales of dry goods, and 7 cases of cambrics. The ship sailed with said cargo from Lisbon about the 2d of June, 1813, bound for Boston, and about four days afterwards was boarded by the British sloop of war Andromeda, and after a short detention was permitted to proceed on the voyage, on the ground, as the master alleges, of having on board a certificate of landing his outward cargo of rice in Lisbon, and he alleges that he knows of no other ground. About twenty-two days afterwards, the ship was boarded by the British frigate Dover, and captured as prize. Eight of the ship's crew were taken out, and a prize crew consisting of a lieutenant and fourteen men, twelve of whom were soldiers, were put on board, and the ship ordered for Halifax, at which place, the ship in company with the frigate arrived, on or about the 7th of July, 1813. The ship and cargo were there libelled as prize, but afterwards given up to the master upon payment of the expenses, to defray which, the master states, that he disposed of the lemons to ships of war lying in the harbor. The master further alleges, that the same certificate of the dischage of the outward cargo was the occasion of his release at Halifax; and the certificate now appears among the papers in the cause. He expressly denies having had at any time during the voyage, any British license on board, and in this assertion he is confirmed by the other witnesses examined in preparatory. The ship sailed from Halifax on the 15th of July, and was proceeding direct for Boston, at the time of the capture. The ship, the salt, and part of the raisins, are claimed by Mr. Samuel Smith, and the residue of the raisins are claimed by the master [Samuel Nickels]. They are both American citizens domiciliated in Boston. The cambrics are claimed by Mr. John C. Jones, consignee thereof, as the property of Antonio Joze Vieina, a Portuguese merchant resident at Lisbon, and as being of French manufacture. The sixty-one bales of dry goods are claimed by Messrs. Hall & Thatcher, consignees thereof, as the property of Sebastian de Lavraondo, a Spanish merchant resident at Cadiz, and as being of Spanish manufacture. The papers on board comport with the property as claimed. The certificate, above alluded to, is signed by a Mr. J. H. T. Sampayo, a Portuguese merchant resident at Lisbon, to whom the outward cargo appears to have been consigned, either by the owners or by the supercargo of the ship, and his certificate is verified by the American consul at Lisbon.

The district court, on the hearing, decreed a restoration of the ship and property as claimed, and damages against the captors, for the injury sustained by the landing of the cargo in Salem instead of Boston. From this decree the captors appealed, as to the claims of Messrs. [Samuel] Smith and [Samuel] Nickels in the whole, but as to the claims of Messrs. Jones, and Hall & Thatcher, in respect only to the damages. It seems, that in the district court an application was made to have a survey of the cargo, upon an allegation that the dry goods were of British manufacture. This application was at first acceded to, but not finally acted upon, so as to obtain a satisfactory result; the learned judge of that court being of opinion, as he states in his decree, that as the property of the goods was proved to be as claimed, it was not proper or admissible to institute the further inquiry prayed for into the fabric, on a suggestion that they were of British manufacture, especially as it could not render the property liable to condemnation as prize (to the captors,) if the suggestion should be verified; and further, that an allowance of such an application would be a departure from the approved rules of practice in prize proceedings. This opinion of the learned judge has been much commented on in the course of the argument, as having deprived the captors of some of the rights, which, but for a subsequent delivery of the property, they would have had before this and the highest appellate court. I feel myself, therefore, called upon in some sort to notice the point, although as the property is no longer in the custody of the court, the opinion, which I have formed, may not be of much avail to the parties. In entering on this discussion, I beg to be understood, as entertaining the highest respect for the opinions of the district court, and if the result of my inquiries differs from that pronounced in its decree, it ought to induce me to entertain some diffidence, as to the correctness of my

own judgment. I feel, however, that I have no right to withhold an opinion, which the occasion requires me to declare. I most entirely accede to the doctrine laid down in The Sarah, 3 C. Rob. Adm. 330, that the prize court ought not in general to admit extrinsic evidence to affect the parties with illegality, unless there appear in the original evidence something, which lays a suggestion for prosecuting the inquiry further, because "if remote suggestions were allowed, the practice of the court would .be led away from the simplicity of prize proceedings, and there would be no end to the accumulation of proof, that would be introduced in order to support arbitrary suggestions." I accede also to the doctrine, that the evidence to acquit or condemn must come from the ship and the preparatory depositions. But I consider it perfectly clear, that the nature and character of the property before the court constitutes a part, and often an essential part of the original evidence. It is literally evidence drawn from the ship itself, and carries with it, in many instances, a certainty, which no papers can ever give. Suppose the ship's papers and the examinations should all negative the existence of contraband on board, and yet it should be made manifest, that contraband goods were concealed, and formed a considerable portion of the cargo; could the court, with any consistency, refuse to order a survey, and strip the mask from fraud and perjury? Suppose the cargo purported to be salt, or some other merchandize of inconsiderable value, and it should be suggested upon strong grounds, that beneath a slight covering of salt was a bulk of English goods of extraordinary value, would the court allow the mere formal papers to overrule evidence so pregnant with concealed hostile interests? Suppose the cargo on board of a neutral ship purported to be the manufacture of the neutral country, and destined for neutral use, will it be contended that a prize court must shut its eyes against the real character of the cargo, when the slightest inspection would prove it entirely hostile?

I think but one answer could be given to these questions, that if the court, under such circumstances, should refuse an unlivery and inspection, it would subject itself to become an instrument of the most manifest injustice. Nor let it be said, that I put strong cases, because they are precisely those, in which a prize court would ordinarily be requested to grant an inspection. Such an inquiry would be useful only in cases of pregnant suspicion, or apparent concealment. It has been suggested, that however proper such an inquiry might be, where the property should be suspected of a hostile character, or if neutral, where the property should be infected with the taint of contraband, or other offence against the laws of war, it ought not to be allowed, where the effect of the inquiry could not extend beyond the mere proof of a municipal forfeiture. But is it certain, that no further effect would

arise? Suppose, in the present case, (and I mean only a supposition, and not any imputation upon the parties) the inquiry had been made, and the cambrics and dry goods, upon examination, had turned out to be clearly of British manufacture, with all the undisguised marks of recent fabric, I ask if it would not have thrown a cloud of suspicion over every part of the cause? Whether it would not have falsified the papers? Whether it would not, connected with the other circumstances, fairly have raised a pregnant suspicion of concealed enemy interests? Whether, at all events, it would not have compelled the parties to relieve the cause by further proof? And yet by the known practice of the court, in cases of fraudulent concealment or falsification of papers, the party would not be entitled to the benefit of further proof, for that is an indulgence granted only to honest mistake and unintentional error. The Juffrouw Anna, 1 C. Rob. Adm. 125; The Welvaart, Id. 122; The Eenrom, 2 C. Rob. Adm. 1. If the parties then could not have obtained the benefit of further proof, the consequence would have been, that their claims must have been rejected, and the property, for want of proof of neutrality, condemned as enemies' property. This is the ordinary result, where the original evidence is doubtful, and the parties are not permitted to introduce new explanations. But allowing that the condemnation would not, upon such a result, have been to the captors, still I think such an inquiry would be of material consequence to them. In the first place, it perfectly protects them from all questions of damages, because the claims of the parties being rejected for a violation of municipal law, they have no standing in court, and consequently cannot moot any questions, as to damages or costs. The Walsingham Packet, 2 C. Rob. Adm. 77. In the next place. I should presume, that as against the United States, the captors would be entitled to their expenses, for as between them, it is not only a case of probable cause, but of actual condemnation. It would be difficult, I should imagine, to contend that those, through whose instrumentality the United States had enforced their rights, were yet so in delicto, as to forfeit their expenses in enforcing those rights. Further, it is to be considered, that the captors seize at their own peril. They have a right to examine and search the cargo, and are not bound by the mere documentary evidence. This may be mere fabrication, but the cargo itself cannot deceive. How then are the court to know, whether there was probable cause to seize, if the law allows the captors to judge by examining the evidence of the cargo itself, and the court shuts its eyes against it? It cannot be, that the law should authorize the captors to judge of the probable ground of seizure by one test, and yet authorize the court to decide on the same question by another. On the whole,

therefore, upon principle, I hold that the prize property not only may be, but necessarily is, a part of the evidence in every prize cause upon the original hearing.

How then stands the point, considered upon the footing of usage? It is certainly not necessary to show, that in cases of concealed contraband, an inspection of the cargo is a usual practice. It seemed conceded at the argument, that, independent of such examination, it would be very difficult, if not impossible, to detect such imposition. Concealed contraband is, as we all know, a ground of condemnation. The Richmond, 5 C. Rob. Adm. 325. And if a practice so essential to justice needed proof, I think it may fairly be inferred from The Richmond, ubi supra, and The Jonge Margaretha, 1 C. Rob. Adm. 189, and The Oster Risoer, 4 C. Rob. Adm. 199. That no decisions are found to this particular point, must result from its being taken as the common usage of the court. From the same cases, and also from the known rule, that false papers, under circumstances, affect the property with condemnation, it must be taken to be a usual practice to examine the cargo, where the description of them in the papers is entirely untrue, as to its nature or quality; for it is by such an examination only, that the court can ordinarily arrive at the knowledge of the fact. In The Oster Risoer, the packages were described as linen, and turned out to be sail cloth, and the master denied any knowledge of the contents of the packages. How did the court ascertain the real contents? Certainly by an examination of the packages after unlivery. The case of The Carl Walter, Id. 207, is decisive to show, that the court will go into the inquiry, as to the national origin of the property, when it becomes material to the cause. In that case, the court suffered the captors to prove by ex parte affidavits that hides, described in the papers as Portuguese hides, were in fact Spanish hides, and the decision ultimately rested upon that fact. Surely, if the court would hear ex parte evidence of the origin, it would not refuse the testimony of sworn surveyors appointed by itself. It is in vain to distinguish that case, by suggesting that doubts grew out of the preparatory examination of the master. The court do not put it upon that ground, and denied further proof to the claimants. I do not however think it material to consider, whether the court proceeded upon the ground of doubts in the original evidence or not; for the case and also that of The Potrimpos (cited in 4 C. Rob. Adm. 213), will still prove, that the origin of the property will in proper cases be ascertained by the court, by an examination, notwithstanding the formal description in the papers. On the whole, I infer from the occasional, though scattered lights, reflected from adjudged cases, and the impracticability of otherwise applying some known rules of the law of war, that

the practice must be conformable to the principle, that I have above stated; viz. that the property, subjected to the prize jurisdiction, is itself in the first instance a part of the necessary evidence in the cause, upon which acquittal or condemnation must go, and that the court will, upon laying a proper foundation, direct a survey, in order to ascertain its nature and character. In some cases, it would be otherwise impossible to decide. If there be no persons or papers on board the ship, and she is found a mere derelict, the nature and quality of the cargo may afford the only means of ascertaining the question of enemy property, or not. The general course of prize proceedings is evidently modelled upon the ancient regulations of the prize courts' of France; and it is extremely clear from these regulations in the commentaries of Valin, that the cargo itself is considered one of the criteria, by which to decide the question of prize or no prize. See Ordon. Lewis, 14; Des Prises, arts. 22, 25, 26; and Valin des Prises, 187, 200, 201, etc. I have taken up more time, than I originally intended, in considering this point, but my apology will be found in its extreme importance, and in the deference, which I feel for a different opinion supported by the district judge.

I proceed now to the question, as to the right of Messrs. Smith & Nickels to have the property claimed by them restored, according to the decree of the district court. There is no question made, as to the claims of Messrs. Jones, and Hall & Thatcher, and therefore I dismiss them from all consideration. It is clear, from all the evidence, that the property belongs to Messrs. Smith & Nickels, as claimed. But it is said by the captors, that notwithstanding this, it is subject to condemnation, because the voyage must have been performed under the protection of a British license; and upon any other supposition it is impossible to account for the exemption of this vessel from British condemnation. I do not think, that, under the circumstances, so pregnant a suspicion would arise of subserviency to British interests, as the captors suppose. We all know, that soon after the war, with a view to facilitate the supply of the British armies in Spain and Portugal, licenses were granted by the British government, to protect from capture cargoes destined to those countries. It has been decided by this court in the case of the Julia, Luce master, that the acceptance and use of such license, on the part of an American citizen, constituted such an avowed adoption of the policy of the enemy, as stamped the property engaged in the traffic with all the penal taints of the hostile character. I look back upon that decision without regret, and, after much subsequent reflection, cannot doubt, that it has a perfect foundation in the principles of public law. To the many authorities there stated, I might have added the pointed lan-

guage of Sir W. Scott, in The Jonge Pieter, 4 C. Rob. Adm. 79, that "without the license of the government, no communication, direct or indirect, can be carried on with the enemy," and the rule strongly illustrative of the principle, which is acknowledged as early as the Year Books (per Brian, J., 19 Edw. IV. 6, cited Thel. Dig. lib. 1, c. 6, § 21), and has received sanction down to the present times (13 Ves. 71; 6 Taunt. 237, 1 Marsh. 558), that every contract and engagement made with the enemy, pending war, is utterly void. But to return; it is well known, that long before the decision of The Julia [8 Cranch (12 U. S.) 181], doubts had existed, as to the legality of such licenses, doubts which must have soon become known to the enemy, and as the policy of maintaining the supply continued the same, it is not extraordinary that the British government should give every encouragement to such shipments, as its necessities required, by prohibiting its cruisers from the capture of vessels, which were engaged in this trade. Under such circumstances, it is not incredible, that a mere certificate of the landing of the outward cargo at Lisbon, signed by a person in whom they had confidence, a person (as the captors allege) acting as a British commissary, should exempt the vessel and cargo from capture on the return voyage. I do not assert, that any such general exemption has been authorized by any orders of the British government; but when the master and crew directly and positively deny any British license to have been used during the voyage, I cannot feel at liberty to set aside their testimony, upon mere suspicions arising from facts, which admit of a fair interpretation in their favor.

But it is said, that the case affords strong presumptions, that the outward cargo was shipped on British account, or at least for British use, and therefore subject to condemnation; and the captors have asked for leave to show, by further proof, that Mr. Sampayo, in whose hands the cargo was placed at Lisbon, is a commissary of the British government, as well as a general merchant there. I admit that, if it were true that the outward cargo had gone on British account, for British use, all the consequences would ensue, for which the captors contend. I do not, however, see the facts in the same light as the argument supposes. There is no evidence in the papers of British connexion. The cargo was consigned to the supercargo, and by him put into the hands of Mr. Sampayo, for sale; and it is admitted, that Mr. Sampayo is a resident Portuguese merchant. The case does not rest here. The whole preparatory examinations disavow any British connexion; and the very circumstance of the capture by the Dover, does, in no small degree, fortify the presumption, that there was no such connexion. The sale of the lemons, at

Halifax, is sworn to have been involuntary, to pay expenses, and the value is too trifling to raise a serious doubt of the fact. Where then is the evidence of enemy connexions? It is drawn exclusively from the existence of the certificate of the landing of the cargo, which, it is said, operates virtually as a license. For myself, I cannot see any very noxious quality in that certificate. Suppose it was known at Lisbon, (and the fact must undoubtedly have been believed, or the present cargo would not have been shipped), that the British government would not molest American vessels returning with cargoes, if they could prove, that they had landed outward cargoes of provisions at Lisbon. Would there be any thing illegal in taking such certificate from a respectable merchant, sanctioned by the American consul? I profess, that I do not perceive the illegality. If the certificate were false in point of statement, I suppose that such an attempt to deceive the enemy cruisers would not have been deemed unjustifiable; why should its truth render it more so? The argument seems to suppose, that if the British government had, by a general order, exempted all American vessels from capture, bound to Lisbon with provisions, that the merely sailing on such a voyage would constitute an illegal subservience to the enemy; and could not be distinguished from the case of sailing with a special British license. The same argument was used in The Julia [supra] for the opposite purpose, namely, to show that both proceedings were legal and innocent; and the answer given in that case I am still disposed to consider, as sufficient to establish the fallacy of the reasoning: "There is all the difference between the cases, that there is between an active personal co-operation in the measures of the enemy, and the merely accidental aid afforded by the pursuit of a fair and legitimate commerce." The trade to Lisbon, on neutral or domestic account, is a commerce authorized by the laws of the United States, and growing out of that amity, which subsists with the Portuguese government. Provisions may be lawfully exported and sold there; and if, thereby, the British interests are aided, or the British policy enforced, it is a mere incidental effect, which no more infects the transactions with hostility, than the trade of a Portuguese merchant with the United Sates would constitute a violation of his neutrality, merely by adding to the revenue of the country. If the mere chance, that a trade may assist the resources, or aid the enterprises of an enemy, through indirect channels, were a sufficient proof of hostile attachment and interest, I know not how, in the present state of the world, any neutral commerce could exist. While, therefore, the trade is by the laws left open to the citizens of the United States, it cannot acquire an illegal character, unless it be carried on expressly for British account, or

shipped under British contract, or destined for British use, or voluntarily incorporated into British service by licenses. which give the immunity of British navigation. In other words, where the trade is carried on bona fide on neutral or domestic account, for general sale in a neutral market, the voyage is not contaminated. although the enemy obtain his supplies from the general stock of that market. If there be any public inconvenience from allowing such a trade, it is a subject for legislative and not for judicial interference.

The court has been asked to admit the captors to further proof, as to the character of Mr. Sampayo, and to show that he acts as commissary to the British troops in Portugal. It is well known, that the prize court is studious to preserve simplicity in its proceedings, and rarely admits the captors to the benefit of further proof, except in cases of strong suspicion. Cases of invocation of papers from other causes are indeed an admitted exception, but in general there must be a foundation laid, in the original evidence, to support the call of further proof. In the present case, it appears that Mr. Sampayo is a Portuguese merchant, resident at Lisbon. His character, as such, is vouched by the American consul, who, I am bound to believe, would not voluntarily practice any imposition upon his country, much less lend his countenance to any illegal traffic with its enemy. I do not think, therefore, that there is in the original evidence, or in the circumstances of the voyage, any foundation laid for a dispensation of the general rule. But even admitting the facts offered to be proved, I am not aware, that they furnish any legal ground for condemnation. It was certainly lawful, and perhaps highly meritorious in Mr. Sampayo, to act as an English commissary; and so long as he continued to act as a Portuguese merchant, and resided in Lisbon, I do not perceive how he would thereby lose his neutral character. No authority has been produced to show, that the mere transaction of business by a neutral merchant. for an enemy government. annihilates his neutral character. It may. under circumstances, afford a presumption of concealed enemy interests in property shipped by such merchant with a destination to the enemy country; but I should have been glad to have seen. in a distinct authority, a principle so broad and comprehensive, as that supposed in the argument. The cases, in which it has been held. that if a neutral be engaged in enemy navigation, it does not thereby subject all his trade from the neutral country on neutral voyages to the enemy character (The Vriendschap, 4 C. Rob. Adm. 166), do, I think. look pretty strongly the other way. And so. if a neutral has a house of trade in the enemy country, as well as in the neutral country, the property in the neutral house is not involved in the principles. that subject that of the enemy house to condemnation. The Portland, 3 C. Rob. Adm. 41. Then how stands the case as to American citizens? They have a legal right to trade with the neutral country, and of course with merchants domiciled there. If, in their own transactions, they do not violate the character, which they hold as American citizens, I do not perceive what it can avail, that the persons with whom they traffic, may be engaged in other business of a hostile character. To be sure, they are prohibited from contracting directly and indirectly with the enemy or for the enemy use; but if they make a bona fide sale to neutral merchants, on their own account, it is difficult to imagine how they can be affected by any ulterior destination of the property. The facts offered to be proved in this case are not, in my judgment, sufficient to found a decree of condemnation, even if proved, because an essential ingredient would still be wanting, viz. a voluntary incorporation into the contracts and policy of the enemy. I over-rule, therefore, the application for further proof, and shall decree restoration of the property of Messrs. Smith & Nickels.

The remaining question is, whether the claimants are entitled to damages? And this depends entirely upon the consideration, whether there was probable cause for the capture: for if there was probable cause, there can be no doubt that the captors had a right to elect the port of destination, provided it was a convenient port. Was there then probable cause for the capture? On this point I confess that I feel no doubt. The ship, at the time of capture, was coming from an enemy port with a large and valuable cargo on board. The papers submitted to the captors for inspection. so far as respected the cargo, were three naked bills of lading; papers of themselves of no great authority in the prize court. No invoice and no letters of advice accompanied them. These were, I will not say, studiously. but certainly effectually kept out of sight. The papers respecting the great mass of property contained in Messrs. Hall & Thatcher's claim were in the hands of a passenger, and never came to the knowledge of the court or the captors. until after the preparatory examinations were had. They were delivered to the consignees, and after having been fully examined by them, were submitted for inspection. That this suppression was, on the part of the passenger, involuntary, seems somewhat difficult to prove; because, being addressed to the consignees of a considerable part of the cargo, he could hardly doubt that they were material to the voyage. I do not find, however. that he denies all knowledge of the contents; and he puts his excuse upon another ground, viz. the belief that he was under no obligation to deliver up the packet to the captors. The letters and invoices addressed to Mr. Smith come under the same consideration. They were not delivered to the captors, and were not submitted to the court, until fully examined by Mr. Smith. and therefore were very properly not admitted to be read at the hearing.

It is a salutary rule of the prize court, to which I shall always endeavor rigidly to adhere. that papers, in order to be allowed as evidence at the hearing, should be delivered up at least at the time of the preparatory examinations, and in an unmutilated and unsuspicious state. Under such circumstances, I think that it would not have been an extraordinary measure, to have required further proofs of property on the part of the claimants. There is another circumstance entitled to consideration. At the time of the capture, no clearance of the cargo at Lisbon sanctioned by the public authorities, was on board. The only paper, that has a color of evidence, is a certificate of the American consul, that the master had regularly entered and cleared his vessel with "a cargo of salt, green and dry fruit, and bales of merchandize" on board, at the port of Lisbon. It is certainly unusual for vessels not to have regular clearances from the proper officers, at their ports of departure; and I cannot perceive, how an American consul can be a proper certifying officer of such a fact. Looking then to the fact, that there were no invoices, no letters of advice, no regular clearance from Lisbon, and a direct voyage from an enemy's port, I think it would be difficult to say, that there were not very powerful reasons for suspicion of illegal traffic. But I do not mean to rest the case on these circumstances. There is a more broad and elementary principle, which embraces and decides this point, and that is, that every voyage from an enemy port, especially with a cargo on board, and without the license of the government. carries with it a presumption of illegal traffic and hostile interests, from which nothing but the most explicit proofs by the claimants can relieve the cause. The papers found on board do not, in such cases, carry with them the usual semblance of verity, for they are soiled by having passed through the enemy's hands, and by being by him deemed sufficient to exempt from capture. Nor are the captors obliged to rest satisfied with the explanation of the persons found on board. It would be idle to suppose, that if the traffic were illegal, some plausible story would not be given out to explain appearances. The presumption of illegal traffic arising, the captors have a right to bring the property in, and subject the whole to the adjudication of a competent tribunal. I should have been glad to have seen a single authority, where a ship was coming from an enemy's port, without a license from its government, and damages or costs had been adjudged against the captors. No such case has been produced, and I think myself warranted, after some investigation, in asserting, that no such case does exist. On the contrary, in cases where trade has been carried on with the enemy under license, and a capture and restoration have taken place, the captor's expenses have been allowed, where there seemed a color for their conduct. The Beurse Van Koningsberg, 2 C. Rob. Adm.

169; The Hendrick, 1 Act. 322: These were cases, in which the license was not disclosed, and of course the presumption of illegal traffic was left in full force. In The St. Antonius, Id. 113, the license was on board, and the circumstances of a contravention of it were not very significant; and the high court of admiralty decreed restoration, but refused damages, although the cargo was by the detention almost wholly lost. The claimants appealed for damages to the lords commissioners, who confirmed the decree appealed from, and condemned the claimants in the costs of appeal. This is certainly a strong case, and shows that lighter suspicions exonerate the captors, where the trade is with an enemy, than are supposed to regulate the judgment of the court in ordinary transactions.

In the case at bar, there was not only the ordinary presumption, but actual proof, of traffic with the enemy. One hundred boxes of lemons of the cargo were deficient, and were accounted for only by the suggestion, that they were sold to defray expenses at Halifax. It was alleged further, that the ship was libelled and afterwards released. What was the evidence of either of these facts? There was not a scrap of paper, or a document, to prove either the one or the other. They rested upon the mere naked assertions of the captured crew. Certainly, a prudent master ought to have procured some certificate of the facts from our public agent at that port, or at least have obtained from the admiralty copies of the proceedings there. I do not say, that these deficiencies would furnish grounds of condemnation, but they throw over the cause an accumulation of doubt, that might perhaps have required the indulgence of further proof. However, I put the case upon the more general ground, which I have above stated, that the coming from an enemy port, without a license, is a good probable cause to exempt the captors from damages, because it affords a presumption of illegal traffic or hostile interests. So strong indeed is the principle, that it has been held, that where a vessel has been captured and carried into the port of its enemy, a strong presumption is laid, that the right of the former proprietor has in fact been legally devested, in a regular and effective manner, and subjected to a legal condemnation; so that such former proprietor cannot assert a title to the property, unless by assuming the burthen of contrary proof. The Countess of Lauderdale, 4 C. Rob. Adm. 283.

I have come to the decision of this cause with some reluctance, because a possible contingent right may have been supposed to exist against a surety to the bond, given by the privateer, with which surety I am connected by affinity. Although I am well satisfied, that the bond never could, under any circumstances, be applied in aid of this case, as its terms do not embrace it, yet I should have been glad to have been spared an investigation, which involves so many important

principles. No other course, however, was left to me, and as the parties consented to my sitting in the cause, I have pronounced the best judgment which, on deliberation, I have been able to form. I feel some consolation, that the captors, if dissatisfied, have a right to appeal to the supreme court, who can award them, from its superior knowledge, complete justice, where I have failed. I decree restoration of the property of Messrs. Smith & Nickels, as claimed; reverse the decree of the district court, as to damages to any of the claimants; and order that the captors recover their costs in the premises.